**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ELEANOR TURBERG,<br><br>      Plaintiff,<br><br>v.<br><br>SUNOCO, INC., IRENE C. BRITT, CHRIS C. CASCIATO, WILLIAM H. EASTER, III, GARY W. EDWARDS, URSULA O. FAIRBAIRN, JOHN P. JONES, III, JAMES G. KAISER, BRIAN P. MACDONALD, JOHN K. WULFF, ENERGY TRANSFER PARTNERS, L.P., KELCY L. WARREN, MARTIN SALINAS, JR., BILL W. BYRNE, MARSHALL S. MCCREA, III, PAUL E. GLASKE, TED COLLINS, JR. AND MICHAEL K. GRIMM<br><br>      Defendants. | JULY TERM 2012<br><br><br><br>**COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934** |

Plaintiff, by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

**NATURE OF THE ACTION**

1.　　Plaintiff, a holder of the common stock of Sunoco, Inc. ("Sunoco" or the "Company") brings this action against the Company and the members of its Board of Directors ("Board"), for violations of sections 14 and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78n, 78t, and Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9, and against Energy Transfer Partners, L.P. ("ETP") and members of its Board of Directors for violations of sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k and 77p.  On June 25, 2012, Energy Transfer Partners, L.P. ("ETP") filed with the

Securities and Exchange Commission ("SEC") a registration statement on Form S-4 and preliminary proxy statement on Schedule 14A ("Preliminary Proxy"), seeking approval of the Agreement and Plan of Merger ("Merger Agreement") by and among Sunoco, ETP, Energy Transfer Partners GP, L.P., Sam Acquisition Corporation ("Merger Sub"), and, for limited purposes, Energy Transfer Equity, L.P. ("ETE"), pursuant to which, among other things, Merger Sub will be merged with and into Sunoco, with Sunoco surviving the merger as a subsidiary of ETP ("Proposed Transaction).

2.     On April 29 2012, the Company executed the Merger Agreement under which ETP will acquire all of the outstanding shares of Sunoco in a unit and cash transaction valued at $50.13 per share, for a total consideration of approximately $5.3 billion.

3.     As a result of the Preliminary Proxy's omitting and misrepresenting material information, Sunoco shareholders will be unable to cast an informed vote regarding the Proposed Transaction.  By omitting and misrepresenting material facts necessary to render the Preliminary Proxy Statement non-misleading, Sunoco and the Board have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and ETP and its directors have violated Section 11 of the Securities Act.

4.     Plaintiff seeks to enjoin the shareholder vote on the Proposed Transaction until such time as Defendants provide adequate, materially accurate information critical for a fair and fully informed shareholder vote on the Proposed Transaction.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1331.  The claims asserted herein arise under Section

14(a) of the Exchange Act [15 U.S.C. § 78n(a)], and Sections 11 and 15 of the Securities Act [15 U.S.C. §§77k and 77p].

6.      Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District, including the dissemination of the materially misleading statements and omissions alleged herein.  Defendant Sunoco is headquartered in this District.

## PARTIES

7.      Plaintiff Eleanor Turberg is, and has been at all relevant times, the owner of shares of Sunoco common stock.

8.      Defendant Sunoco is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.  It maintains its principal corporate offices at 1818 Market Street, Philadelphia, Pennsylvania 19103.

9.      Defendant Irene Britt is a member of the Company's Board of Directors and serves on the Audit Committee and the Corporate Responsibility Committee.

10.      Defendant Chris C. Casciato is a member of the Company's Board of Directors and serves on the Compensation Committee, the Executive Committee, and serves as Chair of the Audit Committee.

11.      Defendant William H. Easter, III, is a member of the Company's Board of Directors and serves on the Audit committee and the Governance Committee.

12.      Defendant Gary W. Edwards is a member of the Company's Board of Directors and serves on the Audit Committee, the Executive Committee, and serves as Chair of the Corporate Responsibility Committee.

13.     Defendant Ursula O. Fairbairn is a member of the Company's Board of Directors and serves on the Corporate Responsibility Committee and the Governance Committee.

14.     Defendant John P. Jones, III, is a member of the Company's Board of Directors and is designated as the Presiding Director.  He also serves on the Compensation Committee, the Executive Committee and is the Chair of the Governance Committee.

15.     Defendant James G. Kaiser is a member of the Company's Board of Directors and serves on the Corporate Responsibility Committee and the Governance Committee.

16.     Defendant Brian P. MacDonald is a Chairman of the Company's Board of Directors and serves as the Company's President and Chief Executive Officer.

17.     Defendant John K. Wulff is a member of the Company's Board of Directors and serves on the Executive Committee and as Chair of the Compensation Committee.

18.     Defendants referenced in ¶¶ 9 through 17 are collectively referred to as the "Individual Defendants" and/or the "Board."

19.     Defendant Energy Transfer Partners, L.P. is a publicly traded, master limited partnership organized under the laws of the State of Delaware and headquartered in Dallas, Texas.  ETP is managed by its general partner, Energy Transfer Partners GP, L.P. ("ETP GP"), and ETP GP is managed by its general partner, Energy Transfer Partners, L.L.C. ("ETP LLC"), which is owned by ETE, another publicly traded master limited partnership ("ETE").

20.     Defendant Kelcy L. Warren is and was at all relevant times Chairman of the Board and Chief Executive Officer of ETP.  Defendant Warren signed the Registration Statement ETP filed with the SEC on June 25, 2012.

21.     Defendant Martin Salinas, Jr. is and was at all relevant times Chief Financial Officer and Principal Accounting Officer of ETP.  Defendant Salinas signed the Registration Statement ETP filed with the SEC on June 25, 2012.

22.     Defendant Bill W. Byrne is and was at all relevant times a director of ETP. Defendant Byrne signed the Registration Statement ETP filed with the SEC on June 25, 2012.

23.     Defendant Marshall S. McCrea, III is and was at all relevant times President, Chief Operating Officer and a director of ETP.  Defendant McCrea signed the Registration Statement ETP filed with the SEC on June 25, 2012.

24.     Defendant Paul E. Glaske is and was at all relevant times a director of ETP. Defendant Glaske signed the Registration Statement ETP filed with the SEC on June 25, 2012

25.     Defendant Ted Collins, Jr. is and was at all relevant times a director of ETP.

26.     Defendant Michael K. Grimm is and was at all relevant times a director of ETP. Defendant Grimm signed the Registration Statement ETP filed with the SEC on June 25, 2012

27.     Defendants reference in ¶¶20-26 are collectively referred to as the "ETP Directors."

## SUBSTANTIVE ALLEGATIONS

28.     Active in the petroleum industry since 1886, Sunoco incorporated in 1971. Through its subsidiaries, Sunoco refines and markets petroleum and manufactures chemicals. Other businesses include logistics and cokemaking.  As of December 31, 2011, Sunoco conducted its business in four segments, Logistics, Retail Marketing, Refining and Supply and Coke.  Sunoco, itself is a "non-operating parent company which includes certain corporate officers."

29.     During 2011 and early 2012, the Company executed a series of strategic actions, shifting away from manufacturing.  Among other decisions, the Company determined to exit the refining business.  Starting in January, 2012, the Company also retained a financial advisor to assist it in conducting a comprehensive strategic review to determine how best to maximize its remaining logistics and retail businesses.

30.     At an April 29, 2012 meeting, the Board unanimously concluded that the Merger Agreement was advisable and in the best interests of Sunoco and its shareholders.  In addition to approving the Merger Agreement, the Board unanimously recommends that Sunoco shareholders voted in favor of the Proposed Transaction at the Sunoco special meeting to approve and adopt the Merger Agreement and the transactions contemplated thereunder.

31.     On April 30, 2012, the Company issued a joint press release, announcing that it had entered into the Merger Agreement with ETP.  According to the press release, the deal was valued at $50.13 per share for an enterprise value of $5.3 billion based on ETP's closing price on April 27, 2012.  About the Proposed Transaction, defendant McDonald stated:

> This transaction will enable Sunoco's businesses to realize their full potential by becoming an important part of a diversified leader in the energy industry.  In addition, it delivers an attractive premium to our shareholders, while enabling them to participate in the future growth of the business. The combination with ETP provides substantial future value-creation opportunities for Sunoco shareholders and ETP unitholders alike.

> ETP recognizes that the steady, ratable cash flows that our logistics and retail businesses generate are backed by great assets, deep expertise, and the potential for future growth. ETP has an interest in growing its Marcellus Shale-related activity, and I am pleased that the combined enterprise will retain a strong Pennsylvania presence.

6

32.     In that April 30, 2012 press release, Sunoco also disclosed that Credit Suisse Securities (USA) LLC ("Credit Suisse") acted as its financial advisor and Wachtell, Lipton Rosen & Katz ("Wachtell") acted as its legal counsel.

33.     Also on April 30, 2012, Sunoco and ETP conducted a joint conference call with analysts regarding the Proposed Transaction.  During that conference call, defendant MacDonald stated:

> Over recent years, Sunoco has completely transformed itself, and we have returned significant value to our shareholders. This opportunity to join forces with ETP is an appropriate next step for us. For Sunoco's shareholders, this deal provides attractive and immediate value on day one, with a 29% premium to Sunoco's 20-day average closing price. By receiving half cash and half units, our shareholders will also benefit from the potential upside of ETP's attractive yield and improving growth profile.
>
> From a business perspective, scale is vital, and by combining with ETP, we will dramatically expand our geographic reach and significantly diversify the opportunities for our businesses. Our high-return logistics and retail businesses offer a strong commercial and operational fit with ETP's existing natural gas and natural gas liquids assets. Sunoco Logistics will also continue to benefit from its extensive organic growth prospects, which will be enhanced by this transaction. As we bring Sunoco and ETP together, we expect minimal integration risk and disruption for our employees, given that the key Sunoco and Sunoco logistics managers will remain in place.

34.     According to Preliminary Proxy, Sunoco shareholders are entitled to elect one of three methods of compensation.  The "standard mix of consideration" entitles a Sunoco shareholder to $25 in cash and 0.5245 limited partner interests in ETP or "Common Units" in exchange for each share of Sunoco common stock.  Sunoco shareholders, however, may elect to receive $50.00 in cash or 1.0490 ETP Common Units per Sunoco share.  The election to take all cash or Common Units, however, is subject to "proration to ensure that the total amount of cash

paid and the total number of ETP common units issued in the merger to Sunoco shareholders as a whole are equal to the total amount of cash and number of ETP common units that would have been paid and issued if all Sunoco shareholders received the standard mix of consideration."

**The Materially Misleading and Incomplete Preliminary Proxy Statement**

35.     On or around June 25, 2012, the Company filed with the SEC the Preliminary Proxy, through which it began the process of seeking shareholder approval for the merger.  The Preliminary Proxy fails to provide the Company's shareholders with material information and provides them with materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

**Background to the Proposed Transaction**

36.     In describing the background to the Proposed Transaction, Defendants omitted material facts from Preliminary Proxy.

37.     On page 33 of the Preliminary Proxy, Defendants state that "The Sunoco board of directors, management and advisors also reviewed ETE's acquisition history and, in particular, ETE's pending acquisition of Southern Union."  Defendants omitted, however, any detail or summary concerning any analysis of ETE's acquisition history or the Southern Union acquisition in particular.  The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.   Southern Union was involved in a complicated and poorly explained restructuring, which the Preliminary Proxy refers to as the "Holdco restructuring."  ETE executed the Holdco restructuring after Credit Suisse delivered its fairness opinion to the Sunoco Board.  The Holdco restructuring may have profound influence on the value of ETP – Common Units which a majority of Sunoco shareholders will own after the

consummation of the Proposed Transaction.  The Preliminary Proxy is bereft of information that will enable Sunoco shareholders to assess the impact of the Holdco restructuring on the ETP Common Units they will own.

38.     On page 34 of the Preliminary Proxy, Defendants discussed meetings that defendant MacDonald conducted with entities interested in business combination with Sunoco. For example, Defendants recount the April 9, 2012 meeting in which the CEO of "Company A" proposed that Sunoco would pay a $2 billion special cash dividend to its shareholders followed by Company A's acquiring all of the outstanding shares in exchange for shares of its own equity. On page 36 of the Preliminary Proxy, Defendants further discuss a revised proposal from Company A, stating:

> Under the terms of the revised proposal, Company A would complete a merger in which it would acquire all of Sunoco's shares in exchange for Company A common stock at an exchange ratio implying a 10% premium to Sunoco's 10-day average trading price prior to executing the merger agreement. The proposal also contemplated that, immediately prior to closing the transaction, Sunoco would declare and pay a $2 billion cash dividend to Sunoco shareholders funded by Sunoco's cash on hand and additional drawings from Sunoco's revolving credit facility. The letter stated that Company A believed the aggregate consideration implied a 20% premium when adjusted for the special cash dividend.

39.     The Preliminary Proxy, however, omits the per-share consideration that Company A offered and the per share cash distribution to Sunoco shareholders.  The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  Without it, Sunoco shareholders are unable to compare the value of Company A's bids to the Proposed Transaction.

40.     Also on page 34 of the Preliminary Proxy, Defendants discuss Company A's presentation of certain analyses of synergies, retail business profitability and environmental risks and costs.   "The analysis presented from Company A," the Preliminary Proxy states, "showed lower synergies, lower profitability from the retail business and higher environmental risks and costs than the estimates that Sunoco had presented to Company A."  Still further, on page 41 of the Preliminary Proxy, Defendants discuss $70 million of operational synergies on an annualized basis that ETP will realize on Sunoco's Logistics business.

41.     The Preliminary Proxy, however, omits a complete analysis of the synergies ETP anticipates achieving from the Proposed Transaction.  The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.   Synergies represent a material component of the value of the Proposed Transaction. Indeed, annualized savings of $70 million as a result of synergies represents hundreds of millions of dollars in value.  As such, an analysis of synergies is essential to shareholders' understanding of the value of the ETP shares they will receive.

42.     On page 35 of the Preliminary Proxy, Defendants recount discussions during an April 10, 2012 meeting among Sunoco management, including defendant MacDonald and Kelcy Warren, the chairman of the board of ETE's general partner and chief executive officer and chairman of the board of ETP's general partner ("Warren").  During the meeting, the Preliminary Proxy discloses, Warren indicated that "ETE would be willing to proceed with its original indication of interest using ETE common units if that were preferable to Sunoco."  Warren concluded, however, that "the use of ETE common units would result in a lower premium to the Sunoco shareholders than would be the case if ETP common units were used for the equity

portion of the merger consideration due to a recent decline in the trading price for ETE common units." The Preliminary Proxy continues that "Credit Suisse also discussed differences between ETE and ETP and the interests in ETE and ETP represented by their common units."

43.     The Preliminary Proxy, however, not only omits any analysis or opinion of Credit Suisse about the differences between ETE and ETP common units but any material factor that lead the Sunoco Board to accept ETP units instead of ETE units. The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote. Information comparing ETP Common Units to those of ETE is necessary to enable Sunoco shareholder to assess the Board's accepting ETP common units rather than ETE units. This importance of this information is enhanced in light of the post-transaction restructurings in which a substantial portion of Sunoco's assets will be contributed to Holdco in which ETP will only maintain a 40% interest, reducing the interest of ETP common unit holders – former Sunoco shareholders – in the assets of Sunoco.

44.     On page 36, the Preliminary Proxy discloses that the Sunoco Board concluded that the Proposed Transaction had greater value for Sunoco shareholders than alternative transactions, concluding that "it was unlikely that another potential acquiror would be willing to offer a premium on the entire Sunoco business that was equal to, or greater than, the value being offered by ETP." The Preliminary Proxy, however, omits any explanation for this conclusory analysis. The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote. In light of the non-solicitation provision, preventing the Sunoco Board from seeking out topping bids, information describing and

analyzing other potential bids is essential for determining whether the Proposed Transaction adequately maximizes the value of their Sunoco shares.

45.     On page 37 of the Preliminary Proxy, Defendants discuss an April 25, 2012 meeting with ratings agencies in New York to confer on "potential ratings implications" of the Proposed Transaction and other transactions the Merger Agreement contemplates.  Omitted from the Preliminary Proxy, however, is any detail or even summary of the meetings with ratings agencies.  The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  Because credit ratings affect borrowing costs of ETP and, in turn, the value of the ETP common units many Sunoco shareholders will receive.

46.     On pages 38 of the Preliminary Proxy, Defendants discuss a new provision to the April 26 draft Merger Agreement.  That provision entitled ETP "to contribute one-half of its interest in Merger Sub to ETE (which we refer to as the "alternate structure"), thereby dividing the interest in Sunoco that was being acquired between ETP and ETE."  On page 39, with respect to the same subject matter, the Preliminary Proxy discloses that at the April 29, 2012 Sunoco Board meeting:

> . . . in  connection with the rendering of its opinion to the Sunoco board of directors on April 29, 2012, Credit Suisse had been instructed to assume that, in connection with the merger, ETE, ETP and Sunoco would effect the transactions contemplated by the post-closing structure, Credit Suisse would still have been able to render its opinion to the Sunoco board of directors on April 29, 2012, subject to the assumptions, qualifications, limitations and other matters set forth therein.

47.     The Preliminary Proxy, however, omits any explanation on the reasoning behind the Sunoco Board's accepting such a structure.  Defendants fail to provide shareholders with any

data or rational, indicating the advantages and disadvantages to ETP of this altered structure.  In addition, Defendants failed to demonstrate that the alternative transaction has a neutral or positive effect on ETP's value.  The parties agreed to this new provision three (3) days prior to Credit Suisse's fairness opinion, but the Preliminary Proxy omits any description of whether Credit Suisse analyzed the alternate structure in any way.  The Preliminary Proxy also fails to discuss whether and how Credit Suisse gained comfort about the structural change as it may have affected its fairness opinion.  The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.   Without this information, Sunoco shareholders will have difficulty understanding of the value of the units they will receive.

48.     In addition, on June 4, 2012 Credit Suisse purportedly confirmed that if the Sunoco Board had instructed it "to assume that, in connection with the merger, ETE, ETP and Sunoco would affect the transactions contemplated by the post-closing structure, Credit Suisse would still have been able to render its opinion to the Sunoco board of directors on April 29, 2012, subject to the assumptions, qualifications, limitations and other matters set forth therein." Yet the Preliminary Proxy omits any analysis by Credit Suisse.  For example, the restructuring must have caused ETP to prepare and provide revised financial projections, projections the Preliminary Proxy fails to disclose.   The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  Information about the Sunoco Board's and Credit Suisse's analysis of the proposed restructuring is material to shareholders because the June 4, 2012 confirmation is, in reality, a second fairness opinion,

but one for which the Preliminary Proxy omits even a summary of the underlying analysis.  The terms of the transactions contemplated by the post-closing restructuring may impact ETP's value materially, an impact Credit Suisse could not have known at the time it delivered its fairness opinion.

49.     On page 58 of the Preliminary Proxy, Defendants disclose the post-closing structure, stating that "immediately following the closing of the merger and the Sunoco Logistics restructuring, (i) ETE will contribute its interest in Southern Union to Holdco in exchange for a 60% equity interest in Holdco and (ii) ETP will contribute Sunoco to Holdco and will retain a 40% equity interest in Holdco."  The Preliminary Proxy, however, omits any information establishing the value of ETE's interest in Southern Union, disabling Sunoco's shareholders from assessing the impact of the post-closing restructuring on ETP's value.  The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  The omitted information is essential for valuing the consideration Sunoco shareholders will receive.

50.     Still further, on page 38 of the Preliminary Proxy, Defendants reference a discussion among Sunoco, Credit Suisse and Wachtell about the size of the breakup fee.  Defendants, however, omit any summary or detail of the contents of that discussion or whether and what type of analyses Sunoco's advisors performed.  The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  On its face, the breakup fee is high, relative to other transactions, and affects the cost of an acquisition to prospective competing bidders.

51.     On pages 38 of the Preliminary Proxy, Defendants discuss an amendment to the ETP partnership agreement, creating a new class of ETP units "that would be exchanged for Sunoco's interest in Sunoco Logistics' general partner and contained a waiver by ETE of a certain amount of its incentive distribution rights in ETP for a specified period of time."  The Preliminary Proxy, however, omits any explanation as to why ETP created a new class of units instead of issuing Class E units.  Defendants also fail to indicate the advantages and disadvantages to Sunoco of receiving Class F units.  Neither do they demonstrate that the receipt of Class F units rather than Class E units has a neutral or positive impact on the consideration Sunoco shareholders will receive.  The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  Sunoco shareholders are entitled to transparency with respect to the value of the ETP units they will receive in exchange for their Sunoco shares.

### *Fairness Opinion of Credit Suisse*

52.     Beginning on page 44 of the Preliminary Proxy, Sunoco and ETP describe the Opinion of Sunoco's Financial Advisor ("Opinion").  The Opinion purports to be that which Credit Suisse rendered to Sunoco's Board of Directors, concluding that as of April 29, 2012, the aggregate merger consideration ETP will pay to Sunoco shareholders is "fair, from a financial point of view. . ." to Sunoco shareholders.  The Opinion, however, omits material facts necessary to render it complete and truthful.

53.     On page 44 of the Preliminary Proxy, Defendants state that Credit Suisse "reviewed certain other information relating to Sunoco, including financial forecasts relating to Sunoco provided to Credit Suisse by the management of Sunoco, as adjusted based on

discussions with and instructions from management of Sunoco (which we refer to as the "Sunoco Forecasts")." Defendants make further reference to Credit Suisse's use of Sunoco's estimates of future financial performance on page 47 of the Preliminary Proxy, stating:

> Estimates of financial performance for Sunoco were based upon financial forecasts provided by Sunoco management as adjusted based on discussions with and instructions from Sunoco management. These adjustments included, among other things, an adjustment to 2012 estimated distributable cash flow for one-time items relating to refining, post-retirement contributions, pension contributions, environmental remediation payments and other adjustments.

54.     The Preliminary Proxy, however, fails to provide a comprehensive list of adjustments, to quantify any adjustment or to explain why Credit Suisse believed any such adjustment was necessary.  Nor does the Preliminary Proxy explain what instructions Credit Suisse received from Sunoco management.  Any such adjustment is material to a shareholder because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.   The financial projections directly impact Credit Suisse's valuation analyses, and adjustments have the potential to materially influence valuation conclusions.   Sunoco's shareholders should have the opportunity to evaluate the adjustments in order to assess whether such adjustments appear reasonable.  Without better explanation and/or quantitative detail, Sunoco's shareholders have no way of knowing the magnitude of such adjustments, hence no way of assessing their reasonableness.

55.     On page 45 of the Preliminary Proxy, Defendants attribute Sunoco's financial forecasts – on which Credit Suisse based its Opinion – to Sunoco management.  "The financial forecasts for Sunoco prepared by management of Sunoco and relied upon by Credit Suisse for purposes of its analyses and opinion," Defendants state, "assumed the completion of certain

refinery closings and certain strategic and other initiatives previously announced by Sunoco in September 2011 and February 2012, respectively."

56.     The Preliminary Proxy, however, is silent on the assumptions management made in the creating the forecasts on which Credit Suisse relied in preparing its Opinion.  Such assumptions are material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  Such information is common in merger proxy statements and enables shareholders to assess whether the projections appear unduly optimistic or pessimistic. Such assessment is critical, as the financial projections are central to many of the valuation analyses prepared by Credit Suisse.

57.     On page 46 of the Preliminary Proxy, with respect to Sunoco's financial projections, Defendants state that, "the financial projections and estimates that Credit Suisse reviewed relating to the future financial performance of Sunoco and ETP reflected certain assumptions regarding the oil and gas industry that were subject to significant uncertainty. . . ." Defendants continued that different assumptions "could have a material impact on Credit Suisse's analyses and opinion."

58.     The Preliminary Proxy, however, is silent on what assumptions about the oil and gas industry Sunoco management included in its financial projections.  Such assumptions about the oil and gas industry are material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  Such information is important to Sunoco's shareholders because, as stated in the Preliminary Proxy, "…as the Sunoco board of directors was aware, the financial projections and estimates that Credit Suisse reviewed relating to the future financial performance

of Sunoco and ETP reflected certain assumptions regarding the oil and gas industry that were subject to significant uncertainty and that, if different than assumed, could have a material impact on Credit Suisse's analyses and opinion."

59.     On page 47 of the Preliminary Proxy, Defendants discussed certain financial metrics Credit Suisse reviewed.  With respect to "distributable cash flow," the Preliminary Proxy states, Credit Suisse reviewed "generally the amount of after tax cash flow for a specified time period available to be distributed by the relevant company."  With respect to "distributed cash flow, Defendants stated, Credit Suisse reviewed "generally the amount of after tax cash flow for a specified time period distributed by the relevant company."

60.     The Preliminary Proxy, however, fails to provide the formula Credit Suisse used to calculate these two financial metrics.  Formulae for such metrics are material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  These qualitative descriptors are ambiguous and lack the quantitative specificity necessary to perform the calculations.  Further, such information is provided for Enterprise Value and EBITDA, the other two metrics cited in the Preliminary Proxy.  If anything, the formulae for Distributable Cash Flow and Distributed Cash Flow are even more important, as these metrics are less widely used (and therefore less commonly understood) than Enterprise Value and EBITDA.

61.     On page 48 of the Preliminary Proxy, Defendants discuss the "Sum-of-the-Parts Basis, Selected Companies Analysis" that Credit Suisse performed.  In that context, they state that in calculating an "implied enterprise valuation reference range on a sum-of-the-parts basis," Credit Suisse added "the implied enterprise valuation reference ranges for its limited and general partnership interests and incentive distribution rights in Sunoco Logistics and its retail businesses

indicated by the selected companies analysis to the implied enterprise valuation reference range for the certain corporate-level assets and other businesses based on the discounted cash flow analysis described below."

62.     The Preliminary Proxy, however, omits the corporate level assets and other businesses that Credit Suisse considered.  The identity and specific valuation for each of the corporate-level assets and other businesses is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote to determine whether Credit Suisse's assessment of Sunoco's value adequately reflected the full value of such assets and businesses.

63.     With respect to Credit Suisse's discounted cash flow ("DCF") analysis, on page 50, the Preliminary Proxy states that "Credit Suisse also performed a discounted cash flow analysis with respect to Sunoco's interests in its logistics business, its retail business and certain corporate-level assets and other businesses."

64.     The Preliminary Proxy, however, fails to define or otherwise to disclose the "cash flow" that Credit Suisse used for either the Logistics business, the Retail business or the corporate-level assets and other businesses.  The definition of "cash flow" in this regard is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  Disclosing the definition enables shareholders to be aware of departures, if any, from the conventional and accepted calculations of cash flow widely used in discounted cash flow analyses.  Further, it is customary to include this information in merger proxy statements.

65.     Further, on page 50, in describing the DCF analysis with respect to the Retail business, the Preliminary Proxy omits any terminal growth assumptions.  Recognizing their

importance, Defendants provide such projected long-term growth rates for the Logistics business and for Corporate Assets and other Businesses. Terminal growth rates for the Retail business are material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote. Terminal growth rate assumptions are important in general, as modest changes sometimes result in widely ranging valuation results. They are particularly important in this instance because, for reasons noted herein, Credit Suisse's selected terminal growth rates in certain other of its analyses appear unduly pessimistic.

66.     Also on page 50, in discussing the DCF analysis with respect to Sunoco's Corporate-Level Assets and other Businesses, the Preliminary Proxy states:

> In performing a discounted cash flow analysis with respect to certain corporate-level assets and other businesses of Sunoco, Credit Suisse applied discount rates ranging from 8.0% to 10.0% and long-term dividend growth rates ranging from 0.0% to 1.0% to the projected unlevered free cash flows from certain corporate-level assets and other businesses of Sunoco which resulted in an implied enterprise valuation reference range of approximately $140 million to $150 million for certain corporate-level assets and other businesses of Sunoco.

67.     The Preliminary Proxy, however, fails to disclose why Credit Suisse applied a "dividend growth" assumption to the cash flows stream from the Corporate-Level Assets and other Businesses. More, Defendants fail to include Credit Suisse's justification for such a low growth rate assumption, the entire range of which lies below expected inflation. The justification for Credit Suisse's applying a dividend growth assumption and a growth rate assumption below expected inflation are material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote. Without this information, Sunoco's shareholders are left to

wonder whether (a) the use of a dividend growth rate forms an appropriate basis to estimate future unlevered cash flow growth in this instance, and (b) whether such a low assumed range of growth rates reflects undue pessimism on the part of Credit Suisse with respect to its valuation of Sunoco.

68.     On page 52 of the Preliminary Proxy, in describing the Selected Transactions Analysis as it relates to Sunoco's Retail Business, Defendants stated, "[w]ith respect to Sunoco's retail business, the financial data reviewed for the selected transactions involving target companies with significant retail fuel distribution businesses included enterprise value (calculated based on the consideration paid in the relevant transaction) as a multiple of latest twelve months EBITDA."  Directly thereafter, Defendants present a table of mergers, including dates, targets, acquirors and enterprise value/LTM EBITDA.[1]

69.     Defendants, however, fail to describe the targets in the table accurately and fail to disclose the deal size for each transaction.  For example, Tosco did not purchase Exxon Mobil in 1999.  The accuracy and completeness of the information about similar transactions is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  According to the Preliminary Proxy (p. 51), size was one of the criteria considered by Credit Suisse to be important in assessing the comparability of the target companies in the selected transactions to Sunoco.  Sunoco's shareholders should be given the opportunity to assess the extent to which deal size is a meaningful criterion influencing corporate value.

---

[1] LTM EBITDA is earnings before income taxes, depreciation and amortization over the last twelve months.

70.     On pages 52-53 of the Preliminary Proxy, Defendants describe Credit Suisse's DCF analysis on a Combined Basis – an analysis based on Sunoco in its entirety.  Defendants state:

> Credit Suisse also performed a discounted cash flow analysis with respect to Sunoco on a combined basis in reliance on the Sunoco Forecasts. In performing the discounted cash flow analysis with respect to Sunoco, Credit Suisse applied discount rates ranging from 9.0% to 11.0% and long-term dividend growth rates ranging from 2.0% to 3.0% to the projected distributable cash flows and dividends for Sunoco, which resulted in an implied reference range of approximately $2.330 billion to $3.399 billion and an implied per share equity valuation reference range of approximately $37.89 to $47.93 per share of Sunoco common stock, as compared to the implied value of the merger consideration of $50.13 per share of Sunoco common stock.

71.     The Preliminary Proxy, however, fails to disclose what type of discount rate Credit Suisse applied to its Combined Basis DCF analysis.  It does not state whether Credit Suisse employed a weighted average cost of capital ("WACC"), cost of equity or other discount rate.  More, Defendants fail to present the assumptions Credit Suisse employed, underlying its calculation of the discount rate.  More, the Preliminary Proxy omits why Credit Suisse applied the discount rate to distributable cash flows and dividends and not to unlevered free cash flow.  Neither does the Preliminary Proxy explain why the selected range of discount rates for the Combined Basis is 9-11% – the rate Credit Suisse applied to the Logistics business – but well above the range of discount rates for the retail business (7-9%) and the Corporate Level Assets and other Businesses (8-10%).

72.     The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  Analysts generally consider inappropriate the application of a WACC discount rate (which is appropriate for unlevered cash

flow streams) to projected dividends (which constitute a levered stream). This departure from analytical convention bears explanation to ensure Sunoco's shareholders that Credit Suisse has not committed an analytical error in arriving at its valuation of Sunoco. With respect to Credit Suisse's application of a 9-11% range of discount rates in valuing Sunoco on a combined basis, simple arithmetic suggests that this assumption is inconsistent with Credit Suisse's other DCF calculations. A weighted average of the discount rates of the logistics business, retail business, and corporate level assets and other businesses would necessarily lie below that of the logistics business alone. Once again, Sunoco's shareholders should be given an explanation to ensure that an analytical error has not been committed.

73.    Last, on pages 55-57 of the Preliminary Proxy, Defendants include what they claim is Sunoco's prospective financial information. These projections, however, omit virtually all of the data on which Credit Suisse relied in its fairness opinion. For example, Defendants provide no division-by-division breakdown of projections, failing to include: (a) the Logistics business distributable cash flow; (b) the Retail business EBITDA; (c) unlevered free cash flows for each of Logistics, Retail, and Corporate Level Assets and other Businesses; (d) distributed and distributable cash flow yields for the Logistics general partner interest and incentive distribution rights; (e) dividends; and (f) LTM EBITDA for the Retail business. More, the Preliminary Proxy omits any discussion of both assumptions pertaining to refinery closings and certain strategic and other initiatives as summarized on page 45 and industry assumptions on page 46.

74.    The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote. Shareholders are entitled to

the best estimate of Sunoco's future cash flows as of the time the Board approved the Proposed Transaction.  Shareholders cannot hope to replicate Sunoco management's inside view of the prospects of the Company and each of its main operating businesses.  In addition, shareholders place greater value on company-specific estimates of future performance than on inferences based on supposedly comparable companies or transactions.  Because of this, for shareholders to be fully informed, Defendants should disclose Sunoco's entire projections model, relevant to each of Credit Suisse's analyses in its Opinion.

### *Value of ETP Units*

75.     To assist shareholders in understanding the value of the consideration they are receiving and to assist them in selecting what consideration to select, the Preliminary Proxy also includes Credit Suisse's DCF analysis with respect to ETP.

76.     On page 54 of the Preliminary Proxy, Defendants state:

> Credit Suisse also performed a discounted cash flow analysis with respect to ETP.  For purposes of this analysis, Credit Suisse relied upon the ETP Forecasts. In performing a discounted cash flow analysis of ETP, Credit Suisse applied discount rates ranging from 8.0% to 10.0% and long-term perpetuity growth rates of 1.0% to 1.5% to ETP's distributable cash flow and distributed cash flows.

77.     Defendants, however, omit from the Preliminary Proxy how they define "cash flow" for ETP.  Just as with the Combined Basis DCF analysis of Sunoco, Defendants also fail to disclose what type of discount rate Credit Suisse used with respect to its DCF analysis of ETP.  More, the Preliminary Proxy fails to explain or justify why Credit Suisse selected a long-term perpetuity growth rate that falls below expected inflation.

78.     The foregoing omitted information is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  As stated above, clarity with

respect to the definitions of financial metrics is important, as is specificity with respect to the explanation of assumptions and methodologies underlying Credit Suisse's fairness opinion. Numerous instances are cited herein that would reasonably cause Sunoco's shareholders concern that Credit Suisse may have made one or more analytical errors and/or selected unduly pessimistic assumptions that could lead to inaccurate valuation conclusions. Improving the disclosure with respect to these issues will enable Sunoco's shareholders: (a) better to assess the general merit of the analyses underlying Credit Suisse's opinion, (b) to correct for some or all of the analytical errors, if any, (c) to correct for some or all of the unduly pessimistic assumptions, if any, and (d) to evaluate the extent to which Credit Suisse's analyses and opinion form a reasonable basis on which to evaluate the merit of the proposed transaction.

79.    In addition, the Preliminary Proxy omits altogether the ETP financial projections that Credit Suisse employed in its DCF analysis.  As noted above, financial projections are among the most important information to a shareholder.  The foregoing omitted information about ETP projections is material to shareholders because a substantial likelihood exists that a reasonable shareholder would consider it important in its deliberations and decision-making process before casting its vote.  Shareholders asked to accept ETP Common Units as consideration or partial consideration for their Sunoco shares are entitled to the best estimate of ETP's future cash flows as of the time the Board approved the Proposed Transaction. Shareholders cannot hope to replicate ETP management's inside view of its prospects.  In addition, shareholders place greater value on company-specific estimates of future performance than on inferences based on supposedly comparable companies or transactions.  Because of this, for shareholders to be fully informed, Defendants must disclose the entire ETP projections model.

80.     ETP's financial projections are particularly important in light of comments in the "Background to the Merger" section of the Preliminary Proxy, at page 36, in which Defendants disclosed that EPT provided financial disclosures to Sunoco management.  As such, Sunoco management tacitly concedes the materiality of the ETP projections and the need to review them to determine the value of the consideration Sunoco shareholders will receive.

## CLAIMS FOR RELIEF

## COUNT I

### For Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### Against Sunoco and the Individual Defendants

81.     Plaintiff brings this Exchange Act claim on behalf of herself as an individual, repeating and re-alleging each of the foregoing allegations as if set forth herein.

82.     Sunoco and the Individual Defendants have caused the Preliminary Proxy to be issued with the intention of soliciting shareholder support for the Proposed Transaction. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9, require full and complete disclosure in connection with proxy solicitations.

83.     The Preliminary Proxy violates Section 14(a) and Rule 14a-9 because it contains misrepresentations and omits material facts, including those set forth above.   Moreover, in the exercise of reasonable care, Sunoco and the Individual Defendants should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

84.     The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiff, who will be deprived of her entitlement to make a fully informed decision if such

misrepresentations and omissions are not corrected prior to the shareholder vote on the Proposed

Transaction.

85.     Because of the false and misleading statements in the Preliminary Proxy, Plaintiff

is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive

relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

### Claim for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

86.     Plaintiff brings this Exchange Act claim on behalf of herself as an individual.

87.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

88.     The Individual Defendants acted as controlling persons of Sunoco within the

meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of

their positions as officers and/or directors of Sunoco, and participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false statements contained in the

Preliminary Proxy filed with the SEC, they had the power to influence and control and did

influence and control, directly or indirectly, the decision making of the Company, including the

content and dissemination of the various statements which Plaintiff contends are false and

misleading.

89.     Each of the Individual Defendants were provided with or had unlimited access to

copies of the Preliminary Proxy and other statements alleged by Plaintiff to be misleading prior

to and/or shortly after these statements were issued and had the ability to prevent the issuance of

the statements or cause the statements to be corrected.

90.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Preliminary Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

91.     In addition, as the Preliminary Proxy sets forth at length, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Preliminary Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

92.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

93.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

### COUNT III

### For Violation of Section 11 of
### the Securities Act Against ETP and the ETP Directors

94.     Plaintiff brings this Exchange Act claim on behalf of herself as an individual.

95.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

96. This Count is brought pursuant to Section 11 of the Securities, Act, 15 U.S.C. § 77k, against all Defendants.

97. On June 25, 2012,[2] the date it was filed with the SEC, the Preliminary Proxy contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The ETP Directors signed the registration statement and/or served the Company as directors.

98. Defendant ETP is the registrant for the S-4 registration statement contained in the Preliminary Proxy. Defendant ETP and the ETP Directors were responsible for the contents and dissemination of the Preliminary Proxy.

99. As issuer of the shares, ETP is strictly liable to Plaintiff for the misstatements and omissions.

100. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Preliminary Proxy were true and without omissions of any material facts and were not misleading.

101. By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act, and, as a result of such violations, Plaintiff has sustained damages.

**COUNT IV**

**For Violation of Section 15 of
the Securities Act Against the ETP Directors**

102. Plaintiff brings this Exchange Act claim on behalf of herself as an individual.

103. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

---

[2] Although the records of the SEC reflect that the Preliminary Proxy was filed June 25, 2012, the document itself is labeled "As filed with the Securities and Exchange Commission on June 22, 2012."

104.    This Count is brought pursuant to Section 15 of the Securities, Act, 15 U.S.C. § 77k, against all Defendants.

105.    The ETP Directors, by virtue of their offices, directorships and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of ETP within the meaning of Section 15 of the Securities Act.  The ETP Directors had the power and influence and exercised the same to cause ETP to engage in the acts described herein.

106.    The ETP Directors' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff.

107.    By virtue of the conduct alleged herein, the ETP Directors are liable for the aforesaid wrongful conduct and are liable to Plaintiff for damages suffered

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)    declaring that the Preliminary Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act;

(B)    enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction unless and until the Company amends the Preliminary Proxy so that it no longer omits material information concerning the Proposed Transaction;

(C)    in the event the Proposed Transaction is consummated prior to entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

(D)    directing that Defendants account to Plaintiff for all damages caused by them and account for all profits and any special benefits obtained as a result of their violation of the federal securities laws;

      (E)      awarding Plaintiff the cost of this action, including expenses of Plaintiff's attorneys and experts; and

      (F)      granting Plaintiff such further relief as the Court deems just and proper.


Dated:  July 6, 2012               **FARUQI & FARUQI, LLP**


                      By:    <u>/s/ Jacob A. Goldberg</u>
                             Jacob A. Goldberg
                             (Pa. Bar Id. 66399)
                             Sandra G. Smith
                             (Pa. Bar Id. 84655)
                             101 Greenwood Avenue, Suite 600
                             Jenkintown, PA  19046
                             Telephone: (215) 277-5770
                             Facsimile: (215) 277-5771
                             Email: jgoldberg@faruqilaw.com
                                     ssmith@faruqilaw.com


                        ***Attorneys for the Plaintiff***